RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0154P (6th Cir.)
File Name: 03a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SHERWIN-WILLIAMS CO.
EMPLOYEE HEALTH PLAN
TRUST,
        *Petitioner-Appellant,*

        v.                              No. 01-1276

COMMISSIONER OF INTERNAL
REVENUE,
        *Respondent-Appellee.*

———————————

On Appeal from the United States Tax Court.
No. 21333-97—Carolyn P. Chiechi, Tax Court Judge.

Argued: March 13, 2003

Decided and Filed: May 23, 2003

Before: MOORE and GIBBONS, Circuit Judges; COHN,
            Senior District Judge.[*]

———————————

*       The Honorable Avern Cohn, Senior United States District Judge for
the Eastern District of Michigan, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Robert K. Olson, THE SHERWIN-WILLIAMS
COMPANY, Cleveland, Ohio, for Appellant. Annette
Wietecha, UNITED STATES DEPARTMENT OF JUSTICE,
APPELLATE SECTION, TAX DIVISION, Washington,
D.C., for Appellee. **ON BRIEF:** Robert K. Olson, Michael
T. Cummins, THE SHERWIN-WILLIAMS COMPANY,
Cleveland, Ohio, for Appellant. Annette Wietecha, Kenneth
L. Greene, UNITED STATES DEPARTMENT OF
JUSTICE, APPELLATE SECTION, TAX DIVISION,
Washington, D.C., for Appellee.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. Sherwin-
Williams Co. Employee Health Plan Trust ("Trust") is a
voluntary employees' beneficiary association under 26 U.S.C.
§ 501(c)(9). As such, much of its income is tax-exempt,
although 26 U.S.C. § 512(a)(3)(E) imposes limits on the
amount of tax-exempt income the Trust can receive from its
investments. This case requires us to determine whether
investment income that a voluntary employees' beneficiary
association has spent on reasonable costs of administration
during a year counts against the § 512(a)(3)(E) limit. The Tax
Court found against the Trust and ruled that its tax payment
had been deficient. We hold that the limit contained in 26
U.S.C. § 512(a)(3)(E) applies only to those assets
accumulated but not spent during the course of the year, and
we **REVERSE** the Tax Court.

## I.  BACKGROUND

### A.  Statutory Background

The Trust is a voluntary employees' beneficiary association, or "VEBA," that was established in 1987 to fund the health care benefits provided to the Sherwin-Williams Company's employees, retired employees, and their families.  During the years at issue in this case, the Trust had over 10,000 participants.  It has been recognized as a VEBA under 26 U.S.C. § 501(c)(9) since 1988.  Like universities that sponsor credit cards or charities that sell their mailing lists to supplement their income, the Trust engages in certain income-producing activities that are not themselves directly related to its mission of providing health care benefits.  *See, e.g.*, Rita Marie Cain, *Marketing Activities in the Non-Profit Sector — Recent Lessons Regarding Tax Implications*, 36 Am. Bus. L.J. 349, 349 (1999); *see also* 1 Marilyn E. Phelan, *Nonprofit Enterprises: Corporations, Trusts, and Associations* § 11:01, at 11-3 (2000) (describing nonprofit organizations' increasing use of income-producing businesses to supplement income).

As a VEBA recognized under § 501(c)(9), the Trust is generally exempt from the federal income tax.  26 U.S.C. § 501(a).  However, recognizing that some non-profit entities exempt from the income tax under § 501(c) had undertaken more income-producing activities that brought them into direct competition with for-profit, fully-taxed enterprises, Congress in 1950 provided that § 501(c) exempt organizations would be taxed on certain income that was unrelated to the purpose constituting the basis of the organization's exemption.  *See* 9 Jacob Mertens, Jr., *The Law of Federal Income Taxation* § 34:260 (2000).  This tax on unrelated business taxable income is codified at 26 U.S.C. § 511(a)(1), and the term "unrelated business taxable income," or "UBTI," is defined in § 512.

Generally speaking, a VEBA's UBTI is calculated by taking its gross income and subtracting any allowable deductions,

excluding from all calculations any "exempt function income." 26 U.S.C. § 512(a)(3)(A).  Exempt function income is that income on which the organization is not taxed, in accord with the organization's § 501(c) exemption.  For purposes of this case, exempt function income is defined as follows:

> [T]he term "exempt function income" means the gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests goods, facilities, or services in furtherance of the purposes constituting the basis for the exemption of the organization to which such income is paid.  Such term also means all income (other than an amount equal to the gross income derived from any unrelated trade or business regularly carried on by such organization computed as if the organization were subject to paragraph (1)), which is set aside—
> (i) for a purpose specified in section 170(c)(4), or
> (ii) in the case of an organization described in paragraph (9) . . . of section 501(c), to provide for the payment of life, sick, accident, or other benefits,
> including reasonable costs of administration directly connected with a purpose described in clause (i) or (ii). If during the taxable year, an amount which is attributable to income so set aside is used for a purpose other than that described in clause (i) or (ii), such amount shall be included, under subparagraph (A), in unrelated business taxable income for the taxable year.

*Id.* § 512(a)(3)(B).  In other words, a § 501(c)(9) organization must pay tax on its gross income unless that income qualifies as exempt function income.  Exempt function income is commonly classified as being of two types:  "member income," which consists of income from members and is described in the first sentence of § 512(a)(3)(B), and "passive income," which generally consists of investment income and qualifies as exempt function income only if it is set aside for

the purposes of charitable gifts, *see id.* § 170(c)(4), for the payment of benefits, or for administrative costs related to such purposes. *See id.* § 512(a)(3)(B).

Concerned that VEBAs were using this "set aside" provision to accumulate tax-free income in an amount that far exceeded the quantities the VEBAs actually needed in order to provide benefits, in 1984 Congress imposed a limit on the amount of certain income that a VEBA could set aside under § 512(a)(3)(B). *See* Staff of the Joint Committee on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 790 (Joint Comm. Print 1984) ("The Congress believed that there should be reasonable limits on the extent to which a tax-exempt entity, such as a voluntary employees' beneficiary association (VEBA) . . . could accumulate income on a tax-favored basis."). The limit is codified at 26 U.S.C. § 512(a)(3)(E) as follows:

> (E) Limitation on amount of setaside in the case of organizations described in paragraph (9), (17), or (20) of section 501(c).—
> (i) In general.—In the case of any organization described in paragraph (9) . . . of section 501(c), a set-aside for any purpose specified in clause (ii) of subparagraph (B) may be taken into account under subparagraph (B) only to the extent that such set-aside does not result in an amount of assets set aside for such purpose in excess of the account limit determined under section 419A (without regard to subsection (f)(6) thereof) for the taxable year (not taking into account any reserve described in section 419A(c)(2)(A) for post-retirement medical benefits).

26 U.S.C. § 512(a)(3)(E). The limit on set-asides is thus determined by reference to § 419A, which provides as follows:

> (c) Account limit.—For purposes of this section—
> (1) In general.—Except as otherwise provided in this subsection, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund—
> > (A) claims incurred but unpaid (as of the close of such taxable year) for benefits referred to in subsection (a),[1] and
> > (B) administrative costs with respect to such claims.
> (2) Additional reserve for post-retirement medical and life insurance benefits.—The account limit for any taxable year may include a reserve funded over the working lives of the covered employees and actuarially determined on a level basis (using assumptions that are reasonable in the aggregate) as necessary for—
> > (A) post-retirement medical benefits to be provided to covered employees (determined on the basis of current medical costs) . . . .

*Id.* § 419A(c). This case requires us to determine whether passive income that the Trust set aside and actually spent on administrative costs during the year counts against § 512(a)(3)(E)'s limit. If § 512(a)(3)(E)'s limit applies only to income that is accumulated and remains in the set-aside fund at the close of the year, then the Trust is well within its limitation on set-aside income, and the income at issue here is non-taxable exempt function income.

**B. The Present Case**

Following an audit, the Commissioner determined that the Trust had underreported its unrelated business taxable income for the years 1991 and 1992. Specifically, the Commissioner determined that the Trust had improperly deducted $1,580,455 in administrative costs for 1991 and $1,852,529

---

[1] Subsection (a) covers, among other benefits, medical benefits such as those provided by the Trust. 26 U.S.C. § 419A(a)(2). [Footnote added.]

in administrative costs for 1992.[2]     Based on those calculations, the Commissioner filed a Notice of Deficiency alleging that the Trust owed $489,941 in taxes for 1991 and $339,924 for 1992.  The Trust filed a petition in the Tax Court to challenge the determination.

Before the Tax Court, the Trust did not argue that the administrative costs were deductible, but instead argued that the income used to pay for those costs was exempt function income and thus non-taxable.  That is, the Trust claimed that the administrative costs were paid for using investment income that the Trust had set aside to pay for administrative costs connected to the payment of benefits, and that the income was thus exempt under § 512(a)(3)(B).  The parties agreed that the Trust had incurred and spent $1,580,455 from 1991 and $1,155,793 from 1992 on administrative costs connected to the provision of benefits;[3] they asked the Tax Court to determine whether the investment income the Trust had set aside and spent to pay those costs counted against the limit in § 512(a)(3)(E).

The Tax Court held that the limit in § 512(a)(3)(E) applies to all income set aside for the administrative costs of the provision of health benefits, whether or not the funds were actually spent.  *See Sherwin-Williams Co. Employee Health Plan Trust v. Comm'r*, 115 T.C. 440, 451 (T.C. 2000).  The

---

[2]The numbers for the two years were broken down as follows:  In 1991, the Trust had erred in deducting $1,424,371 in compensation for officers, directors, and trustees, and $156,084 for other deductions, or a total of $1,580,455.  In 1992, the Trust had erred in deducting $1,588,555 in compensation for officers, directors, and trustees, and $264,974 for other deductions, for a total of $1,853,529; the IRS allowed a specific deduction of $1,000, bringing the 1992 total to $1,852,529.

[3]Although the Trust initially claimed that in 1992 it had set aside and spent $1,853,529 of its investment income on administrative costs under § 512(a)(3)(B), the Trust has conceded before the Tax Court and before us that it had reported only $1,155,793 as UBTI for 1992.  We rely on that smaller figure.

Tax Court focused primarily on the Trust's argument that § 512(a)(3)(E) limits only income set aside under § 512(a)(3)(B)(ii), which governs income set aside for the provision of benefits.  Rejecting the Trust's argument that clause (ii) does not specifically mention the costs of administration associated with those benefits, the Tax Court pointed out that clause (ii) specifically includes administrative costs, because clause (ii)'s reference to set-asides for the provision of health benefits is directly followed by language reading, "including reasonable costs of administration directly connected with a purpose described in clause (i) or (ii)." *Sherwin-Williams*, 115 T.C. at 449 (quoting § 512(a)(3)(B)).  In a footnote, the Tax Court also rejected the Trust's argument that a VEBA's income is not taxable if spent to further its exempt purpose, because, according to the Tax Court, § 512(a)(3)(E)(i) represents Congress's attempt to limit "the amount of income that may be set aside," regardless of how or whether the income is eventually spent.  *Sherwin-Williams*, 115 T.C. at 457 n.20.  Having determined that income set aside and spent for the administrative costs of providing health care benefits counted against the limit in § 512(a)(3)(E), the Tax Court calculated the Trust's limit and the amount of assets counting against the limit, and concluded that the Trust was over its § 419A limit.  *Sherwin-Williams*, 115 T.C. at 453-56.  Accordingly, the Tax Court held that the income at issue for 1991 and 1992 was not exempt function income, and that the income must be counted in the Trust's UBTI.  *Id.* at 456.

We review the Tax Court's factual findings for clear error and its application of law de novo.  *Ekman v. Comm'r*, 184 F.3d 522, 524 (6th Cir. 1999).

## II.  ANALYSIS

As discussed above, the Trust argues that because the investment income at issue here was set aside for and spent on the reasonable costs of administering its benefits payments, the income is exempt function income that is not subject to

the § 512(a)(3)(E)(i) limit. The parties agree that this investment income from the two years was set aside and spent on administrative costs directly connected with the provision of benefits. However, § 512(a)(3)(E)(i) imposes a limit on how much income can be set aside as tax-exempt; income set aside "for any purpose specified in clause (ii) of subparagraph (B) may be taken into account" as exempt function income "only to the extent that such set-aside does not result in an amount of assets set aside for such purpose in excess of the account limit determined under section 419A . . . for the taxable year (not taking into account any reserve described in section 419A(c)(2)(A) for post-retirement medical benefits)." 26 U.S.C. § 512(a)(3)(E)(i). The question presented here is whether the limit is meant to cap the total amount of income that a VEBA may set aside under § 512(a)(3)(B) over the course of a year, or whether it acts as a cap only on the amount of income that the VEBA may accumulate, by setting aside an amount in excess of the amount needed to cover the costs of administration during the course of a year. The Tax Court has previously suggested that the cap is on accumulation, reasoning that "[i]n general, the income of a welfare benefit fund is not subject to [unrelated business income tax] if the total assets of the fund at yearend do not exceed the account limit." *Gen. Signal Corp. & Subsidiaries v. Comm'r*, 103 T.C. 216, 241 (T.C. 1994). We agree that the statute's text, structure, and authoritative interpretations indicate that § 512(a)(3)(E)(i) is a limit on how much money a VEBA may accumulate, not on how much it may set aside. We thus interpret the limit not to apply to funds that are set aside and spent on the reasonable costs of administration directly connected with the provision of benefits, as provided in § 512(a)(3)(B), during the course of the year.

Beginning with the statute's text, the language of § 512(a)(3)(E)(i) suggests that its limit does not apply to funds set aside and spent on appropriate administrative costs during the taxable year. That is, the limit is not on the total amount that the VEBA may set aside, tax-free, over the course of a year, but on the amount that the VEBA may

accumulate at year's end. The statute's operative clause states that a set-aside qualifies as exempt function income only to the extent that it "does not result in an amount of assets set aside" that would exceed the account limit for the taxable year. *Id.* § 512(a)(3)(E)(i). The inquiry into whether set-aside income "result[s] in an amount" in excess of the account limit suggests a focus not on the aggregate quantity of money that has passed through the account over the relevant window of time, but on the sum that exists in the account at the relevant moment.[4]

---

[4] We note that the Tax Court correctly held that the limit does apply to funds set aside for administrative costs. The Trust argues that § 512(a)(3)(B) identifies four sources of income: member income, income set aside for the charitable purposes described in § 170(c)(4), income set aside for payment of benefits, and income set aside for the administrative costs of charitable purposes or payment of benefits; accordingly, the Trust argues, when § 512(a)(3)(E)(i) imposes a cap on assets set aside for the purposes described in § 512(a)(3)(B)(ii), the limit only applies to income set aside for payment of benefits, not for the administrative costs associated with those payments. This interpretation contravenes the most straight-forward reading of § 512(a)(3)(B)(ii), according to which administrative costs of paying benefits are, according to the flush language that follows clauses (i) and (ii), "includ[ed]" in (B)(ii)'s provisions for payment of benefits. *Id.* § 512(a)(3)(B). Provisions appearing in a statute's "flush language," or that language that appears flush against the margins in the code, generally apply to "the entire statutory section or subsection," *Snowa v. Comm'r*, 123 F.3d 190, 196 n.10 (4th Cir. 1997), and here, where the flush language immediately follows the set-off language and obviously refers to the set-off clauses by beginning with the word, "including," it is clear that the provisions governing administrative costs should be understood as belonging in both clauses (i) and (ii). Rather than adding language referring to administrative costs in two places, the drafters used the common technique of writing the phrase once and indicating its application to both clauses. Thus the limit in § 512(a)(3)(E)(i), which applies to income set aside for purposes specified in § 512(a)(3)(B)(ii), applies to income set aside for both the payment of benefits and the administrative costs directly associated with that purpose. Our decision in *Phi Delta Theta Fraternity v. Commissioner*, 887 F.2d 1302 (6th Cir. 1989), on which the Trust relies, answered the question whether income that was never formally set aside in a separate fund but that was actually spent on a tax-exempt purpose could qualify as exempt function income, *id.* at 1305-08, and did

The statute's structure supports this conclusion that the limit is on the amount of income that is still set aside at the end of the year, not to amounts that were set aside but were spent over the year's course. Section 512(a)(3)(E)(i)'s explicit reference to § 419A to define the limit is instructive. Section 419A(c)(1) defines the limit as the amount necessary to cover "claims incurred but unpaid (as of the close of such taxable year)" and the administrative costs of those claims. *Id.* § 419A(c)(1). If the cap on the amount that a VEBA could set aside to pay health benefits over the course of a year were limited to the amount that the VEBA would need to pay only those claims that were unpaid as of the end of each year, as the Commissioner suggests, then the tax exemption would serve very little purpose. That is, under the Commissioner's theory, a VEBA would be limited to a tax exemption only in the amount of whatever claims it would have left unpaid on the last day of the year. Whether the income that the VEBA set aside over the year would count as exempt function income would depend entirely on how quickly the VEBA paid its claims: If the VEBA paid its claims swiftly, it would have few incurred but unpaid claims, a consequently lower limit on set-aside income, and greater taxable income; if the VEBA paid its claims slowly, it would have many incurred but unpaid claims, a higher limit under § 512(a)(3)(E)(i), and lower taxable income.

If, however, the § 512(a)(3)(E)(i) limit is interpreted as applying only to the funds in the set-aside account at the close of the taxable year, then the statute's reference to § 419A makes sense. Section 419A is clear that to determine the limit on set-asides, one determines how much set-aside income must be on hand, or accumulated, in order for the VEBA to fulfill its purpose of supplying benefits. Interpreting the limit to apply only to those funds that are set aside and on hand — that is, accumulated — makes § 512(a)(3)(E)(i)'s reference to

---

not actually address whether § 512(a)(3)(E)(i) applies to the costs of administering a benefits plan.

§ 419A internally coherent. It permits the VEBA to set aside income sufficient to pay and administer its claims on a tax-exempt basis. However, it prohibits a VEBA from accumulating more income than actuarially necessary to pay its claims for that year.

Finally, our interpretation finds support in § 512's legislative history and subsequent Treasury regulations. Although the House Conference Report to the Deficit Reduction of 1984 is somewhat ambiguous on this issue, referring both to the amount "set aside," which suggests a limit on total set-asides, and to the "account limit," which suggests a limit on the amount within the account at a particular time, *see* H.R. Conf. Rep. No. 98-861, at 1163 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1851, the House Ways and Means Committee Report explicitly takes the latter approach. The House Ways and Means Committee explained § 512(a)(3)(E)(i) as seeking to impose "reasonable limits" on a VEBA's ability to "accumulate" set-aside income, not simply as cutting back on a VEBA's ability to set aside income to fund and administer its benefits plan. H.R. Rep. No. 98-432, at 1292 (1984), *reprinted in* 1984 U.S.C.C.A.N. 697, 952; *accord* Joint Committee on Taxation Staff, General Explanation at 790. The Treasury Department's governing regulations interpreting the 1984 limit are even more explicit, stating that the § 512(a)(3)(E)(i) cap on exempt function income applies to "the amounts set aside in a VEBA . . . *as of the close of a taxable year*." Prop. Treas. Reg. 1.512(a)-5T, A-3(a), 51 Fed. Reg. 4332 (Feb. 4, 1986) (emphasis added); *see also id.* at A-3(b) (stating that exempt function income includes income set aside for payment of benefits as long as "the total amount set aside in the VEBA . . . as of the close of the taxable year" does not exceed the § 419A limit). The reference to the amounts set aside "as of" the year's end suggests an inquiry into the amount in the fund on that date, not an inquiry into what has passed through the fund over the past year.

We hold that § 512(a)(3)(E)(i)'s limit on accumulating set-aside income does not apply to income that was set aside and spent on the reasonable costs of administering health care benefits under § 512(a)(3)(B). Such spent income is exempt function income, not subject to tax under § 512(a)(3)(A).

## III. CONCLUSION

We need not address whether the Tax Court correctly calculated the limit and relevant assets under § 512(a)(3)(E)(i), because the income at issue was set aside and spent on the reasonable costs of administration and is not subject to that limit. Thus the $1,580,455 at issue for 1991 and the $1,155,793 at issue for 1992 are non-taxable exempt function income, and we **REVERSE** the Tax Court.